## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SPECTRANET TECHNOLOGIES LLC,<br><br>Plaintiff,<br><br>v.<br><br>IMC-CHICAGO, LLC d/b/a IMC TRADING;<br>IMC AMERICAS, INC.; IMC GLOBAL<br>HOLDINGS LLC; RCA TELECOM LLC; and<br>TOGGLE COMMUNICATIONS LLC,<br><br>Defendants. | Civil Action No. 1:26-cv-05838<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff SpectraNet Technologies LLC ("SpectraNet") brings this action for patent infringement under 35 U.S.C. § 1 *et seq.*, against Defendants IMC-Chicago, LLC d/b/a IMC Trading; IMC Americas, Inc.; IMC Global Holdings LLC; RCA Telecom LLC; and Toggle Communications LLC (collectively, "Defendants" or "IMC Group"), and alleges as follows:

## NATURE OF THE CASE

1. This action arises under 35 U.S.C. § 271 for Defendants' infringement of SpectraNet's U.S. Patent Nos. 10,959,123 (the "'123 Patent"); 11,516,694 (the "'694 Patent"); and 12,414,002 (the "'002 Patent") (collectively, the "Patents-in-Suit").

## PARTIES

2. SpectraNet is a limited liability company organized under the laws of Delaware, with its principal place of business at 5830 Granite Parkway, Suite #100-216, Plano, TX 75204.

3. Defendant IMC-Chicago, LLC d/b/a IMC Trading ("IMC Trading") is an Illinois limited liability company with its principal place of business at 233 South Wacker Drive, Suite

4300, Chicago, IL 60606. IMC Trading may be served through its registered agent, Illinois Corporation Service Company located at 801 Adlai Stevenson Drive, Springfield, IL 62703-4261.

4. Defendant IMC Americas, Inc. ("IMC Americas") is an Illinois corporation with its principal place of business at 233 South Wacker Drive, Suite 4300, Chicago, IL 60606. IMC Americas may be served through its registered agent, Illinois Corporation Service Company located at 801 Adlai Stevenson Drive, Springfield, IL 62703-4261.

5. Defendant IMC Global Holdings LLC ("IMC Global Holdings") is a Delaware limited liability company. On information and belief, IMC Global Holdings has its principal place of business at 233 South Wacker Drive, Suite 4300, Chicago, IL 60606. IMC Global Holdings may be served through its registered agent, Corporation Service Company located at 251 Little Falls Drive, Wilmington, DE 19808.

6. Defendant RCA Telecom LLC ("RCA") is a Delaware limited liability company. On information and belief, RCA has its principal place of business at 233 South Wacker Drive, Suite 4300, Chicago, IL 60606. RCA may be served through its registered agent, Corporation Service Company located at 251 Little Falls Drive, Wilmington, DE 19808.

7. Defendant Toggle Communications LLC ("Toggle") is a Delaware limited liability company. On information and belief, Toggle has its principal place of business at 233 South Wacker Drive, Suite 4300, Chicago, IL 60606. Toggle may be served through its registered agent, Corporation Service Company located at 251 Little Falls Drive, Wilmington, DE, 19808.

## JURISDICTION AND VENUE

8.      This is an action for patent infringement arising under the provisions of the Patent Laws of the United States of America, Title 35 U.S.C. § 1 *et seq.*

9.      This Court has subject matter jurisdiction over SpectraNet's claims under 28 U.S.C. §§ 1331 and 1338(a).

10.     Venue in this District is proper under 28 U.S.C. §§ 1391 and 1400(b).

11.     Defendant IMC Trading resides in this District. It is a limited liability corporation organized under the laws of Illinois with its principal place of business located in this District. Defendant IMC Trading also operates in this district under assumed names that currently include IMC Financial, IMC Financial Markets, and IMC Trading. On information and belief, Defendant IMC Trading is a wholly owned subsidiary of Defendant IMC Americas.

12.     Defendant IMC Americas resides in this District. It is a corporation organized under the laws of Illinois with its principal place of business located in this District. On information and belief, Defendant IMC Americas is a wholly owned subsidiary of Defendant IMC Global Holdings.

13.     On information and belief, Defendant IMC Global Holdings has a regular and established place of business in this District. Its website identifies its Chicago office as the "largest IMC location" with more than 650 employees that serves as "the perfect base for IMC's North American operations." *See*, *Chicago US*, https://www.imc.com/us/contact/offices/chicago (last visited May 19, 2026).

14.     Defendant IMC Global Holdings also conducts and continues to conduct business in this District and has committed and continues to commit acts of patent infringement in this District. IMC Global Holdings directly or through subsidiaries, intermediaries, or related entities

(including each of the other Defendants in this lawsuit) ships, distributes, makes, uses, offers for sale, sells, imports, and/or advertises (including by providing interactive web pages) its products and/or services in the United States and in this District.

15. This Court has both general and personal jurisdiction over IMC Trading. IMC Trading resides in this District and has committed acts within this District giving rise to this action.

16. This Court has both general and personal jurisdiction over IMC Americas. IMC Americas resides in this District and has committed acts within this District giving rise to this action.

17. This Court has both general and personal jurisdiction over IMC Global Holdings. IMC Global Holdings has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over IMC Global Holdings would not offend traditional notions of fair play and substantial justice.

18. On information and belief, Defendant Toggle has a regular and established place of business in this district. Toggle has submitted multiple filings to the Federal Communications Commission ("FCC") that identify its address as 233 South Wacker Drive # 4300 in Chicago, Illinois, which is located within this District. Additionally, Toggle operates multiple antenna stations located within this District, for example, at S570 Bateman Road, Elburn, Illinois 60119 and at 1N741 Pilsen Road, West Chicago, Illinois 60185. At these stations, Toggle transmits low latency wireless messages using, at least, the the call-sign WI2XAJ that are the subject of this suit and constitute acts of patent infringement. On information and belief, Toggle leases or owns the land upon which these antenna stations are located.

19. Defendant Toggle thus conducts and continues to conduct business in this District and has committed, and continues to commit, acts of patent infringement in this District. Toggle directly or through subsidiaries, intermediaries, or related entities (including each of the other Defendants in this lawsuit), ships, distributes, makes, uses, offers for sale, sells, imports, and/or advertises (including by providing interactive web pages) its products and/or services in the United States and in this District.

20. This Court has both general and personal jurisdiction over Toggle. Toggle has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Toggle would not offend traditional notions of fair play and substantial justice.

21. On information and belief, Defendant RCA has a regular and established place of business in this District. RCA has submitted multiple filings to the FCC that identify its address as 233 South Wacker Drive # 4300 in Chicago, Illinois, located within this District. Additionally, RCA operates multiple antenna stations located within this District, for example, at 1616 East Laraway Road, Joliet, Illinois 60433 and 1N741 Pilsen Road, West Chicago, Illinois 60185. At these stations, RCA transmits low latency wireless messages that are the subject of this suit and constitute acts of patent infringement. On information and belief, RCA leases or owns the land upon which these antenna stations are located.

22. Defendant RCA thus conducts and continues to conduct business in this District and has committed and continues to commit acts of patent infringement in this District. RCA directly or through subsidiaries, intermediaries, or related entities (including each of the remaining Defendants in this lawsuit) ships, distributes, makes, uses, offers for sale, sells,

imports, and/or advertises (including by providing interactive web pages) its products and/or services in the United States and in this District.

23.     This Court has both general and personal jurisdiction over RCA. RCA has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over RCA that would not offend traditional notions of fair play and substantial justice.

24.     Defendants in this action work collectively as part of a group of commonly owned and commonly controlled organizations (collectively referred to as the "IMC Group") that have worked together as a trading firm that performed and continues to perform infringing acts in this District. The IMC Group, along with other foreign and U.S.-based entities (which act as part of a global network) have operated as agents of one another and vicariously as parts of the same enterprise to work in concert together and enter into agreements closer than arm's length. For example, a representative of Defendant IMC Trading has publicly sworn that IMC Trading acts in concert with Defendants RCA and Toggle, and that these three Defendants are commonly owned and controlled as part of an enterprise to operate as a worldwide trading firm. Further, Defendants share the same office and, on information and belief, employees.

## THE ASSERTED PATENTS

25.     The '123 Patent, entitled "Low Latency Wireless Messaging," issued on March 23, 2021. A true and correct copy of the '123 Patent is attached as **Exhibit 1**.

26.     The '694 Patent, entitled "Low Latency Wireless Messaging," issued on November 29, 2022. A true and correct copy of the '694 Patent is attached as **Exhibit 2**.

27.     The '002 Patent, entitled "Low Latency Wireless Messaging," issued on September 9, 2025. A true and correct copy of the '002 Patent is attached as **Exhibit 3**.

28.     Plaintiff SpectraNet is the owner of the '123 Patent, the '694 Patent, and the '002 Patent and has the exclusive right to sue and collect remedies for past, present, and future infringements of same.

## BACKGROUND

29.     SpectraNet incorporates the allegations of the foregoing paragraphs as if fully restated herein.

30.     The inventions patented in the Patents-in-Suit originate from the groundbreaking work of Mr. Jeffrey Adams. In some applications, milliseconds make the difference between earning and losing millions of dollars. Mr. Adams was focused on developing the fastest possible systems and methods for reliably communicating small pieces of information over long distances.

31.     Message latency refers to the length of time it takes a message to traverse a system. Mr. Adams was insightful enough to realize that multiple factors contribute to message latency, including propagation latency (the time it takes to send a message between two points) and message size latency (the time required to process the message before and after it is received).

32.     Regarding propagation latency, Mr. Adams realized that radio waves offered benefits other mediums could not match. First, radio waves are fast. Radio waves travel through the air at nearly the speed of light while light in fiber optic cables travels at approximately 67% of the speed of light. And second, while lower frequency radio waves have line of sight limitations, higher frequency, ionospheric transmissions allow messaging over long distances, even across oceans.

COMPLAINT FOR PATENT INFRINGEMENT

33. But this was only one piece of the puzzle. While the ionospheric transmission medium offered benefits in propagation latency, it posed problems in message latency. The processing time for ionospheric radio wave transmissions is much greater than other mediums like fiber optic cables. Propagation latency gains provided by ionospheric transmissions were quickly consumed by losses in message latency as the size of the message increased. Mr. Adams found an elegant way to address this issue. He realized that he could favorably effect message latency in ionospheric communications with encoding that was known by the receiving device thereby reducing bit-by-bit processing that was eating up the latency gains.

34. Ionospheric transmissions also pose reliability problems because they are sensitive to ever-changing environmental conditions that can diminish or eliminate the latency advantage. This problem was addressed by selecting and controlling physical-layer transmission parameters (e.g., carrier frequency, modulation type, transmission power, sampling rate, buffer size) based on latency considerations and channel-bandwidth constraints.

35. The '123 Patent is generally directed to methods, systems, and devices for RF transmission in the ionosphere or other atmospheric layer at frequencies in the Medium Frequency (MF), High Frequency (HF), or Very High Frequency (VHF) spectrum band to a remote receiving device. A request for a particular action is received, and a particular value is encoded using a format derived to effect message latency into a message for transmission, where the particular value is known in advance to the remote receiving device as corresponding to the particular action.

36. The claims of the '123 Patent include determining transmission parameters for the wireless transmission based at least on a message latency and a predefined channel bandwidth, and controlling transmission of the encoded message using the determined transmission

COMPLAINT FOR PATENT INFRINGEMENT 8

parameters. Example transmission parameters and constraints are identified, such as carrier frequency, modulation type, transmission power, sampling rate, and buffer size. The '123 Patent describes message latency concepts that include propagation-related considerations from origin to destination, including latency caused by radios, amplifiers, antennas, and related equipment.

37. The '694 Patent is generally directed to methods and devices for transmission of a message in the ionosphere or other atmospheric layer at frequencies in the Medium Frequency (MF), High Frequency (HF), or Very High Frequency (VHF) spectrum to a remote receiving device, including: receiving a request to transmit a particular message; encoding the particular message into an encoded message using a format derived to effect message latency, where the encoded message is known in advance to the remote receiving device as corresponding to the particular message, and where the encoded message is smaller than the particular message; determining transmission parameters based at least on message latency and a predefined channel bandwidth; and transmitting the encoded message using the determined transmission parameters.

38. The '694 Patent describes example transmitter-side components, including a "front end unit" adapted/configured to receive messages for wireless transmission (including, in certain embodiments, requests for financial transactions) and a controller adapted/configured to determine transmission parameters for low-latency transmission based at least on message latency and predefined channel bandwidth.

39. The '002 Patent is generally directed to methods and devices for RF transmission of a message in the ionosphere or other atmospheric layer at frequencies in the Medium Frequency (MF), High Frequency (HF), or Very High Frequency (VHF) spectrum to a remote receiving device, including: receiving a request to transmit a particular message toward a remote receiving device; encoding the particular message into an encoded message using a format

COMPLAINT FOR PATENT INFRINGEMENT                                                              9

derived to reduce message latency (where the encoded message is known in advance to the remote receiving device as representing the particular message and is smaller than the particular message); and transmitting the encoded message over a frequency in an ionospheric band using one or more transmission parameters selected based on estimated propagation latency and based on a predefined channel bandwidth for transmission over the ionospheric band.

40.     The '002 Patent's claims further describe that estimated propagation latency for the transmission parameters may be determined for multiple transmission parameters and may be based on factors such as time of day, time of a solar cycle, time of year, number of bounces between earth and the ionosphere, and distance.

41.     The '002 Patent also includes claims directed to receiver-side methods, including receiving an encoded message transmitted via the ionospheric band according to transmission parameters selected based on estimated propagation latency and chosen channel bandwidth; decoding the encoded message into a decoded message known in advance by the receiving system as corresponding to the encoded message (with the decoded message longer than the encoded message); and performing an action based on decoding the encoded message.

42.     The Patents-in-Suit are directed to patent-eligible, non-abstract subject matter. The claims of the Patents-in-Suit are directed to methods, systems, and devices for reducing latency in the communication of encoded messages via an ionospheric band. The claims focus on specific, technological improvements in wireless communications—namely, reducing end-to-end message latency by (i) encoding messages into compact representations that are known a priori to a receiving device (thereby reducing message-size-related latency), and (ii) selecting and controlling concrete, physical-layer transmission parameters (*e.g.*, carrier frequency, modulation type, transmission power, sampling rate, buffer size) based on latency considerations and

channel-bandwidth constraints applicable to ionospheric communications. The claims of the Patents-in-Suit describe and claim concrete, engineering-driven techniques for reducing latency in RF transmissions, implemented in the operation of RF communication systems including ionospheric transmissions.

## ALLEGATIONS OF PATENT INFRINGEMENT

43. Defendants, jointly and/or individually, make, use, sell, offer for sale, and/or import certain products, services, and systems.

44. Defendants operate as a worldwide trading firm as the IMC Group. The IMC Group is one of the largest players in the High Frequency Trading ("HFT") market. HFT is a form of market involvement that employs algorithms to quickly perform very large numbers of trades in response to varying market conditions.

45. In the HFT market, speed is critical. Lowering the latency of sharing trading information gives HFT firms an advantage by allowing them to capitalize on small changes in commodity prices before other traders have time to react. For example, if the price of a commodity goes up in a U.S. market, HFT traders can trigger a "buy" trade overseas, such as in Japan or Europe, before the overseas markets have time to react and the overseas prices go up. This is known as latency arbitrage.

46. While the monetary benefit for any given trade may be minimal, HFT traders use high-volume trading to leverage small profits into huge gains.

47. It has been estimated that HFT constitutes more than 50% of trading volume in U.S. markets. *See* Anirban Banerjee & Prince Roy, *High-Frequency Traders' Evolving Role as Market Makers*, 82 PAC. BASIN FIN. J. (2023), https://www.sciencedirect.com/science/article/abs/pii/S0927538X2300255X.

COMPLAINT FOR PATENT INFRINGEMENT 11

48. This opportunity for large profits has produced fierce competition among HFT traders seeking to gain millisecond, microsecond, or even nanosecond advantages over their competitors. HFT firms have invested hundreds of millions of dollars developing networks that save fractions of a second. *See, e.g.*, Christopher Steiner, *Wall Street's Speed War*, FORBES (July 16, 2012), https://www.forbes.com/forbes/2010/0927/outfront-netscape-jim-barksdale-daniel-spivey-wall-street-speed-war.html; *Ultra-Fast Telecom Cable from Herring Cove to Europe Nearly Complete*, CBC NEWS (Aug. 12, 2015), https://www.cbc.ca/news/canada/nova-scotia/ultra-fast-telecom-cable-from-herring-cove-to-europe-nearly-complete-1.3188581.

49. Technical analysis verifies that HFT traders are commercially utilizing the High Frequency spectrum ("shortwave") communications to trade in financial markets. This can be deduced from the time it takes overseas markets to react to changes in U.S. markets. In one analysis performed by the Head of Quantitative Analytics for the Deutsche Börse Group, the reaction time was measured between the Chicago Mercantile Exchange and the Eurex Exchange near Frankfurt, Germany. The analysis revealed a large volume of trades occurring 9 milliseconds faster than possible using the best alternatives like optical fiber. This phenomenon was first observed in 2020 and grew to dominate trading performed at slower speeds. *See, e.g.*, Stefan Schlamp, *The Long and the Short End of the Latency Spectrum*, DEUTSCHE BÖRSE GROUP (Sept. 21, 2023), https://www.deutsche-boerse.com/resource/blob/3690190/b99127ac79c1b2753206c4df5140a535/data/Open%20Day%202023%20%20Presentation,%20The%20Long%20&%20Short%20End%20of%20The%20Latency%20Spectrum.pdf.

COMPLAINT FOR PATENT INFRINGEMENT                                    12

50. Shortwave trading activity has similarly been identified between the Chicago and Tokyo trading markets. *See* Stephen Tyc, *Market Data vs. Private Fills*, YOUTUBE (Oct. 18, 2022, at 18:15), https://www.youtube.com/watch?v=a_Awz6eC0NU.

51. The volume of trading indicates that shortwave trading activity is being used at a large, commercial scale.

52. Defendants operate multiple antenna stations transmitting in the shortwave spectrum.

53. For example, Defendant Toggle operates an antenna station located at 1708 East Pike Street, Seattle, Washington that was and/or is licensed to transmit radio waves within at least seven different bands within the shortwave spectrum. As the antenna points east, it is believed that this is an HF path between Seattle and Chicago. This HF antenna is visible from the street:

**HF Antenna**



54. Defendant Toggle also operates an antenna station located at S570 Bateman Road, Elburn, Illinois 60119 that was and/or is licensed to transmit radio waves within at least 8

different bands within the shortwave spectrum. The azimuth of this antenna has been observed pointing towards Asia.



55.     Defendant RCA operates an antenna station located at 2076 North Bauer Road, Ritzville, Washington that was and/or is licensed to transmit radio waves within more than two dozen different bands inside the shortwave spectrum.

56.     Defendant RCA also operates antenna stations located at 1616 East Laraway Road, Joliet, Illinois 60433 and at 1N741 Pilsen Road, West Chicago, Illinois 60185 that are licensed to transmit radio waves within dozens of different bands inside the shortwave spectrum.





57.     According to public FCC filings, RCA's Joliet, Illinois and West Chicago antenna stations use the call-sign WO2XPY. Communications have been detected near Seattle in the shortwave spectrum that self-identify with the call-sign WO2XPY.

58.     While shortwave communications provide latency advantages, they also present certain challenges. In particular, shortwave communications can be transmitted at a significantly reduced bandwidth as compared to optical fiber transmissions. *See, e.g.*, David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic. As a result, the latency advantages provided by shortwave can be reduced if the messages being sent are too long. Thus, shortwave traders tightly encode their prices or other information in just a few bytes or bits, or lose their latency advantage. *See* Bob Van Valzah, *Shortwave Trading: Part II*, SNIPER IN MAHWAH BLOG (June 7, 2018), https://sniperinmahwah.wordpress.com/2018/06/07/shortwave-trading-part-ii-faq-and-other-chicago-area-sites/.

59. Upon information and belief, Defendants jointly and/or individually have used, and continue to use, shortwave signals to provide low latency communications for its global HFT enterprise. These shortwave trading methods infringe the Patents-in-Suit.

60. Further identification of Defendants' accused methods and instrumentalities will be provided in Plaintiff's infringement contentions pursuant to the Court's scheduling order and local rules.

61. To the extent applicable, SpectraNet has at all times complied with the marking statute, 35 U.S.C. § 287 for each of the Patents-In-Suit.

62. As set forth below, Defendants individually and jointly make, sell, and use, without any license or permission from SpectraNet, technology protected by the Patents-in-Suit.

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 10,959,123

63. SpectraNet reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

64. The '123 Patent contains 3 independent claims and 20 total claims. Claim 1 of the '123 Patent recites:

A method for ionospheric Radio Frequency (RF) transmission of a message in a High Frequency (HF) band to a remote receiving device, the method comprising:

receiving a request for a particular action to be performed;

encoding a particular value using a format derived to effect message latency into an encoded message for transmission to the remote receiving device over a frequency in an ionospheric HF frequency band, wherein the particular value is known a priori to the remote receiving device as corresponding to the particular action;

determining transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a) message latency and on (b) a predefined channel bandwidth; and

> transmitting the encoded message in the ionospheric HF frequency band according to the determined transmission parameters to the remote receiving device.

65. Defendants, jointly and/or individually, have directly infringed and continue to directly infringe one or more claims of the '123 Patent, including but not limited to claim 1[1], under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, at least by making, using, selling, offering to sell, and/or importing in or into the United States without authorization products, systems, and/or services covered by one or more claims of the '123 Patent.

66. For example, Defendants' joint and individual use of shortwave trading methods comprises ionospheric Radio Frequency (RF) transmission of a message in a High Frequency (HF) band to a remote receiving device.

67. Defendants jointly and individually receive a request for a particular action to be performed. The IMC Group is a global HFT company that profits from making trades on the world's financial markets. It has established control over antenna stations positioned in the vicinity of one of the world's largest market centers in Chicago. These antennas have been observed pointing towards Tokyo. Chicago to Tokyo is a known path for HF trading transactions. Defendants' antenna stations have also been observed with a microwave dish

---

[1] Throughout this Complaint, wherever SpectraNet identifies specific claims of the Patents-in-Suit that Defendants infringe, SpectraNet expressly reserves the right to identify additional asserted claims and products in accordance with the local patent rules. Specifically identified claims throughout this Complaint are provided for notice pleading only and are not presented as "exemplary" claims of the Patents-in-Suit.

COMPLAINT FOR PATENT INFRINGEMENT <span style="float:right">17</span>

antenna directly linked to a microwave tower located very close to the Chicago Mercantile Exchange.[2]

68.     Defendants' network is directed toward HFT trading. On information and belief, to execute a trade, a request for a particular action to be performed (*e.g.*, buy or sell a certain security) is received by Defendants prior to the transmission of a message in the HF band.

69.     Defendants, jointly and/or individually, encode a particular value using a format derived to effect message latency into an encoded message for transmission to the remote receiving device over a frequency in an ionospheric HF frequency band, where the particular value is known a priori to the remote receiving device as corresponding to the particular action.

70.     Defendants, jointly and/or individually, have transmitted and continue to transmit messages in the ionospheric HF frequency band (shortwave). To enable trade execution, upon information and belief, the particular value will be known a priori to the remote receiving as corresponding to the particular action to allow trade execution at the remote location.

71.     Defendants, jointly and/or individually, determine transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a) message latency and on (b) a predefined channel bandwidth. Defendants RCA's and Toggle's FCC licenses specify that transmissions from the antennas meet various requirements. For example, each licensed frequency band is assigned an emission designator, and authorized power:

---

[2] *See* David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic; Bob Van Valzah, *Shortwave Trading: Part I*, SNIPER IN MAHWAH BLOG (May 7, 2018), https://sniperinmahwah.wordpress.com/2018/05/07/shortwave-trading-part-i-the-west-chicago-tower-mystery/.

| Licensee Name: RCA Telecom LLC | | File Number: 0841-EX-CN-2024 | | Call Sign: WP2XCZ |
| --- | --- | --- | --- | --- |

Frequency Information

Ritzville (ADAMS), WA - NL 47-13-44; WL 118-27-03

| Frequency | Station Class | Emission Designator | Authorized Power | Frequency Tolerance (+/-) |
| --- | --- | --- | --- | --- |
| 14.35-14.99 MHz | FX | | 4.853 kW (ERP) | 0.00005 % |
| | | 24K0G1D | | |
| 15.8-16.1 MHz | FX | | 4.853 kW (ERP) | 0.00005 % |
| | | 24K0G1D | | |
| 16.2-16.36 MHz | FX | | 4.853 kW (ERP) | 0.00005 % |
| | | 24K0G1D | | |
| 17.41-17.48 MHz | FX | | 4.853 kW (ERP) | 0.00005 % |
| | | 24K0G1D | | |

*See* FCC Experimental Radio Station Construction Permit and License for WP2XCZ, available at https://apps.fcc.gov/els/GetAtt.html?id=389986.

72.     The first four digits of the emission designator defines the allowable bandwidth for transmissions inside the relevant frequency range. For example, an emission designator that begins with 24K0 allows a 24 kHz bandwidth. To comply with its FCC licenses, Defendants must determine transmission parameters based on the channel bandwidth predefined for the respective frequency range.

73.     Defendants must also determine transmission parameters based on message latency. In the high stakes world of HFT trading, speed is critical and the wrong combination of parameters can delay a message. Similarly, fluctuations in environmental conditions can impact the frequencies available for reliable ionospheric transmissions.[3] Thus, on information and belief, Defendants select message parameters, such as modulation type and frequency, to meet or beat

---

[3] *See* David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic.

COMPLAINT FOR PATENT INFRINGEMENT                                                                 19

latency constraints while complying with licensing constraints such as the predefined channel bandwidth.

74. Defendants, jointly and/or individually, transmit the encoded message in the ionospheric HF frequency band according to the determined transmission parameters to the remote receiving device.

75. Defendants' collective and individual acts of infringement occurred and continue to occur without license or authorization.

76. On information and belief, Defendants, jointly and/or individually, also actively direct or control others to perform or use elements of claim 1 such that the infringing activity is entirely attributable to one or more Defendants. For example, on information and belief, the conduct of subsidiary Defendants is actively controlled by the corporate parents. Further, on information and belief, the Defendants act as each other's agents or contract with each other to perform one or more steps of claim 1, and/or act a joint enterprise.

77. Defendants are also liable under 35 U.S.C. § 271(b) for actively inducing infringement and/or continuing to actively induce infringement. Defendants, jointly and/or individually, actively induce other Defendants and/or related entities to infringe the '123 Patent. On information and belief, Defendants possess and/or possessed a specific intent to induce infringement, and in fact did and continue to induce infringement.

78. All Defendants have been aware of the '123 Patent at least since the filing of this lawsuit and continue to infringe and induce others to infringe at least claim 1 of the '123 Patent. Defendants knew or should have known that their actions would cause direct and indirect infringement of the '123 Patent. On information and belief, Defendants acted with objective recklessness by proceeding despite an objective high likelihood that their actions constituted

infringement of a valid patent, where such action constitutes egregious misconduct. Such infringement is thus willful, egregious, wanton, deliberate, and in flagrant disregard for SpectraNet's rights in the '123 Patent.

79.     SpectraNet has been damaged because of Defendants' infringing conduct. Each Defendant is, thus, liable to SpectraNet in an amount that adequately compensates SpectraNet for the infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

### COUNT II: INFRINGEMENT OF U.S. PATENT NO. 11,516,694

80.     SpectraNet reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

81.     The '694 Patent contains 3 independent claims and 20 total claims. Claim 1 of the '694 Patent recites:

> A method for ionospheric Radio Frequency (RF) transmission of a message in a High Frequency (HF) band to a remote receiving device, the method comprising:
>
> > receiving a request to transmit a particular message to the remote receiving device;
> >
> > encoding the particular message using a format derived to effect message latency into an encoded message for transmission on a frequency in an ionospheric HF frequency band, wherein the encoded message is known a priori to the remote receiving device as corresponding to the particular message, and wherein the encoded message is smaller than the particular message;
> >
> > determining transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a) message latency and on (b) a predefined channel bandwidth; and
> >
> > transmitting the encoded message over the frequency in the ionospheric HF frequency band using the determined transmission parameters.

82.     Defendants, jointly and/or individually, have directly infringed and continue to directly infringe one or more claims of the '694 Patent, including but not limited to claim 1,

under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, at least by making, using, selling, offering to sell, and/or importing in or into the United States without authorization products, systems, and/or services covered by one or more claims of the '694 Patent.

83. For example, Defendants' collective and individual use of shortwave trading methods comprises ionospheric Radio Frequency (RF) transmission of a message in a High Frequency (HF) band to a remote receiving device to execute trades.

84. Defendants, jointly and/or individually, receive a request to transmit a particular message to the remote receiving device. The IMC Group is a global HFT company that profits from making trades on the world's financial markets. It has established control over antenna stations positioned in the vicinity of at least one of the world's largest market centers in Chicago. These antennas have been observed pointing towards Tokyo. Chicago to Tokyo is a known path for HF trading transactions. Defendants' antenna stations have also been observed with a microwave dish antenna that is directly linked to a microwave tower located even closer to the Chicago Mercantile Exchange. *See* David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic; Bob Van Valzah, *Shortwave Trading: Part I*, SNIPER IN MAHWAH BLOG (May 7, 2018), https://sniperinmahwah.wordpress.com/2018/05/07/shortwave-trading-part-i-the-west-chicago-tower-mystery/.

85. To execute a trade, a request to transmit a particular message (*e.g.*, buy or sell a certain security) would be received by Defendants prior to the transmission of a message in the HF band. A remote receiving device must receive the message to execute a trade at a different location.

86.     Defendants, jointly and/or individually, encode a particular message using a format derived to effect message latency into an encoded message for transmission on a frequency in an ionospheric HF frequency band, where the encoded message is known a priori to the remote receiving device as corresponding to the particular message, and where the encoded message is smaller than the particular message.

87.     Defendants have transmitted and continue to transmit messages in the ionospheric HF frequency band (shortwave). As already explained, shortwave transmissions offer limited bandwidth which necessitates encoding to effect message latency. To enable trade execution, upon information and belief, the encoded message will be known *a priori* to the remote receiving as corresponding to the particular message to allow trade execution at the remote location.

88.     Furthermore, the encoded messages are smaller than the particular message otherwise it would diminish the latency advantage provided by the shortwave medium.

89.     Defendants, jointly and/or individually, determine transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a) message latency and on (b) a predefined channel bandwidth.

90.     Defendants RCA's and Toggle's FCC licenses specify that transmissions from the antennas meet various requirements. For example, each licensed frequency band is assigned an emission designator, and authorized power:

Licensee Name: RCA Telecom LLC    File Number: 0841-EX-CN-2024  Call Sign: WP2XCZ
Frequency Information

Ritzville (ADAMS), WA - NL 47-13-44; WL 118-27-03

| Frequency | Station Class | Emission Designator | Authorized Power | Frequency Tolerance (+/-) |
|---|---|---|---|---|
| 14.35-14.99 MHz | FX | 24K0G1D | 4.853 kW (ERP) | 0.00005 % |
| 15.8-16.1 MHz | FX | 24K0G1D | 4.853 kW (ERP) | 0.00005 % |
| 16.2-16.36 MHz | FX | 24K0G1D | 4.853 kW (ERP) | 0.00005 % |
| 17.41-17.48 MHz | FX | 24K0G1D | 4.853 kW (ERP) | 0.00005 % |

*See* FCC Experimental Radio Station Construction Permit and License for WP2XCZ, available at https://apps.fcc.gov/els/GetAtt.html?id=389986.

91.     The first four digits of the emission designator defines the allowable bandwidth for transmissions inside the relevant frequency range. For example, an emission designator that begins with 24K0 allows a 24 kHz bandwidth.

92.     To comply with its FCC licenses, Defendants must determine transmission parameters based on the channel bandwidth predefined for the respective frequency range.

93.     Defendants must also determine transmission parameters based on message latency. In the high stakes world of HFT trading, speed is critical and the wrong combination of parameters can delay a message. Similarly, fluctuations in environmental conditions can impact the frequencies available for reliable ionospheric transmissions.[4] Thus, on information and belief, Defendants select message parameters such as modulation type and frequency to meet or beat the

---

[4] *See* David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic.

latency requirement constraints while complying with licensing constraints such as the predefined channel bandwidth.

94.     Defendants, jointly and/or individually, transmit the encoded message over the frequency in the ionospheric HF frequency band using the determined transmission parameters.

95.     Defendants' collective and individual acts of infringement occurred and continue to occur without license or authorization.

96.     On information and belief, Defendants, jointly and/or individually, also actively direct or control others to perform or use elements of claim 1 such that the infringing activity is entirely attributable, one or more Defendants. For example, on information and belief, the conduct of subsidiary Defendants is actively controlled by the corporate parents. Further, on information and belief, the Defendants act as each other's agents or contract with each other to perform one or more steps of claim 1, and/or act a joint enterprise.

97.     Defendants are also liable under 35 U.S.C. § 271(b) for actively inducing infringement and/or continuing to actively induce infringement. Defendants, jointly and/or individually, actively induce other Defendants and/or related entities to infringe the '694 Patent. On information and belief, Defendants possess and/or possessed a specific intent to induce infringement, and in fact did and continue to induce infringement.

98.     Defendants have been aware of the '694 Patent at least since the filing of this lawsuit and continue to infringe and induce others to infringe at least claim 1 of the '694 Patent. Defendants knew or should have known that their actions would cause direct and indirect infringement of the '694 Patent. On information and belief, Defendants acted with objective recklessness by proceeding despite an objective high likelihood that their actions constituted infringement of a valid patent, where such action constitutes egregious misconduct. Such

COMPLAINT FOR PATENT INFRINGEMENT                                                                25

infringement is thus willful, egregious, wanton, deliberate, and in flagrant disregard for SpectraNet's rights in the '694 Patent.

99.     SpectraNet has been damaged because of Defendants infringing conduct. Each Defendant is, thus, liable to SpectraNet in an amount that adequately compensates SpectraNet for the infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 12,414,002

100.     SpectraNet reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

101.     The '002 Patent contains 3 independent claims and 20 total claims. Claim 1 of the '002 Patent recites:

1. A method for ionospheric Radio Frequency (RF) transmission in a High Frequency (HF) band, the method comprising:

receiving a request to transmit a particular message towards a remote receiving device;

encoding the particular message into an encoded message using a format derived to reduce message latency, wherein the encoded message is known to the remote receiving device as representing the particular message, and wherein the encoded message is smaller than the particular message; and

transmitting the encoded message over a frequency in an ionospheric HF band using one or more transmission parameters selected based on an estimated propagation latency for the one or more transmission parameters and based on a predefined channel bandwidth for transmission over the ionospheric HF band.

102.     Defendants, jointly and/or individually, have directly infringed and continue to directly infringe one or more claims of the '002 Patent, including but not limited to claim 1, under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, at least by making, using,

selling, offering to sell, and/or importing in or into the United States without authorization products, systems, and/or services covered by one or more claims of the '002 Patent.

103. For example, Defendants' collective and individual use of shortwave trading methods comprises ionospheric Radio Frequency (RF) transmission in a High Frequency (HF) band to execute trades.

104. Defendants, jointly and/or individually, receive a request to transmit a particular message towards a remote receiving device. The IMC Group is a global HFT company that profits from making trades on the world's financial markets. It has established control over antenna stations positioned in the vicinity of at least one of the world's largest market centers in Chicago. These antennas have been observed pointing towards Tokyo. Chicago to Tokyo is a known path for HF trading transactions. Defendants' antenna stations have also been observed with a microwave dish antenna that are directly linked to a microwave tower located even closer to the Chicago Mercantile Exchange. *See* David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic; Bob Van Valzah, *Shortwave Trading: Part I*, SNIPER IN MAHWAH BLOG (May 7, 2018), https://sniperinmahwah.wordpress.com/2018/05/07/shortwave-trading-part-i-the-west-chicago-tower-mystery/.

105. To execute a trade, a request to transmit a particular message (*e.g.*, buy or sell a certain security) would be received by the transmitting entity prior to the transmission of a message in the HF band. A remote receiving device receives the message at the other end of the transmission to execute a trade at a different location.

106. Defendants, jointly and/or individually, encode the particular message into an encoded message using a format derived to reduce message latency, where the encoded message is known to the remote receiving device as representing the particular message, and where the encoded message is smaller than the particular message.

107. Defendants, jointly and/or individually, have transmitted and continue to transmit messages in the ionospheric HF frequency band (shortwave). As already explained, shortwave transmissions offer limited bandwidth which necessitates encoding using a format derived to reduce message latency. To enable trade execution, upon information and belief, the encoded message will be known to the remote receiving as representing the particular message to allow trade execution at the remote location.

108. Furthermore, the encoded messages were, and are, smaller than the particular message to avoid diminishing the latency advantage provided by the shortwave medium.

109. Defendants, jointly and/or individually, transmit the encoded message over a frequency in an ionospheric HF band using one or more transmission parameters selected based on an estimated propagation latency for the one or more transmission parameters and based on a predefined channel bandwidth for transmission over the ionospheric HF band.

110. Defendants RCA's and Toggle's FCC licenses specify that transmissions from the antennas meet various requirements. For example, each licensed frequency band is assigned an emission designator, and authorized power:

Licensee Name: RCA Telecom LLC          File Number: 0841-EX-CN-2024  Call Sign: WP2XCZ
Frequency Information

Ritzville (ADAMS), WA - NL 47-13-44; WL 118-27-03

| Frequency | Station Class | Emission Designator | Authorized Power | Frequency Tolerance (+/-) |
|---|---|---|---|---|
| 14.35-14.99 MHz | FX | 24K0G1D | 4.853 kW (ERP) | 0.00005 % |
| 15.8-16.1 MHz | FX | 24K0G1D | 4.853 kW (ERP) | 0.00005 % |
| 16.2-16.36 MHz | FX | 24K0G1D | 4.853 kW (ERP) | 0.00005 % |
| 17.41-17.48 MHz | FX | 24K0G1D | 4.853 kW (ERP) | 0.00005 % |

*See* FCC Experimental Radio Station Construction Permit and License for WP2XCZ, available at https://apps.fcc.gov/els/GetAtt.html?id=389986.

111. The first four digits of the emission designator defines the allowable bandwidth for transmissions inside the relevant frequency range. For example, an emission designator that begins with 24K0 allows a 24 kHz bandwidth.

112. To comply with its FCC licenses, Defendants must determine transmission parameters based on the channel bandwidth predefined for the respective frequency range, which are in the ionospheric HF band.

113. Defendants must also determine transmission parameters based on an estimated propagation latency for the transmission parameters. In the high stakes world of HFT trading, speed is critical and the wrong combination of parameters can delay a message. Similarly, fluctuations in environmental conditions can impact the frequencies available for reliable ionospheric transmissions. *See* David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018),

COMPLAINT FOR PATENT INFRINGEMENT                                          29

https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic. Thus, on information and belief, Defendants select message parameters such as modulation type and frequency to meet or beat the latency requirement constraints while complying with licensing constraints such as the predefined channel bandwidth.

114. Defendants, jointly and/or individually, transmit the encoded message over the frequency in the ionospheric HF frequency band using the determined transmission parameters.

115. Defendants' collective and individual acts of infringement occurred and continue to occur without license or authorization.

116. On information and belief, Defendants, collectively and individually, also actively direct or control others to perform or use elements of claim 1 such that the infringing activity is entirely attributable to one or more Defendants. For example, on information and belief, the conduct of subsidiary Defendants is actively controlled by the corporate parents. Further, on information and belief, the Defendants act as each other's agents or contract with each other to perform one or more steps of claim 1, and/or act a joint enterprise.

117. Defendants are also liable under 35 U.S.C. § 271(b) for actively inducing infringement and/or continuing to actively induce infringement. Defendants jointly and/or individually actively induce other Defendants and/or related entities to infringe the '002 Patent. On information and belief, Defendants possess and/or possessed a specific intent to induce infringement, and in fact did and continue to induce infringement.

118. Defendants have been aware of the '002 at least since the filing of this lawsuit and continue to infringe and induce others to infringe at least claim 1 of the '002 Patent. Defendants knew or should have known that their actions would cause direct and indirect infringement of the '002 Patent. On information and belief, Defendants acted with objective recklessness by

proceeding despite an objective high likelihood that their actions constituted infringement of a valid patent, where such action constitutes egregious misconduct. Such infringement is thus willful, egregious, wanton, deliberate, and flagrant disregard for SpectraNet's rights in the '002 Patent.

119.    SpectraNet has been damaged because of Defendants' infringing conduct. Each Defendant is, thus, liable to SpectraNet in an amount that adequately compensates SpectraNet for the infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

a.    A judgment that each Defendant has infringed the Patents-in-Suit;

b.    An injunction barring each Defendant and its officers, directors, agents, servants, employees, affiliates, attorneys, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors and assigns, from further acts of infringement of the Patents-in-Suit; alternatively, a judicial decree that each Defendant pay an ongoing royalty in an amount to be determined for continued infringement after the date of judgment;

c.    An award of damages adequate to compensate for each Defendant's infringement of the Patents-in-Suit, and in no event less than a reasonable royalty for each Defendant's acts of infringement, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

d.    An award of trebled damages under 35 U.S.C. § 284;

e.    A declaration that this case is exceptional under 35 U.S.C. § 285;

f.        An award of Plaintiff's costs and attorneys' fees under 35 U.S.C. § 285 and other applicable law; and

g.        Any other remedy to which Plaintiff may be entitled.

## **DEMAND FOR JURY TRIAL**

SpectraNet demands a trial by jury on all claims and issues triable of right by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: May 20, 2026

/s/ *Paul J. Skiermont*
Paul J. Skiermont (IL Bar No. 6278464)
Todd A. Martin (TX Bar No. 24066556)
Michael D. Ricketts (TX Bar No. 24079208)
**SKIERMONT DERBY LLP**
1601 Elm Street, Suite 4400
Dallas, TX 75201
Phone: (214) 978-6600
Fax: (214) 978-6601
pskiermont@skiermontderby.com
tmartin@skiermontderby.com
mricketts@skiermontderby.com

Charles C. Koole (CA Bar No. 259997)
**SKIERMONT DERBY LLP**
633 West Fifth Street, Suite 5800
Los Angeles, CA 90071
Phone: (213) 788-4500
Fax: (213) 788-4501
ckoole@skiermontderby.com

*Attorneys for Plaintiff*
SpectraNet Technologies LLC

COMPLAINT FOR PATENT INFRINGEMENT                                    33